**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

| Chief Justice: | Justices: |
| --- | --- |
| Clifford W. Taylor | Michael F. Cavanagh |
| | Elizabeth A. Weaver |
| | Marilyn Kelly |
| | Maura D. Corrigan |
| | Robert P. Young, Jr. |
| | Stephen J. Markman |

FILED DECEMBER 29, 2008

UNITED STATES FIDELITY INSURANCE &
GUARANTY COMPANY,
     Plaintiff-Appellee,

v                                  No. 133466

MICHIGAN CATASTROPHIC CLAIMS
ASSOCIATION,
     Defendant-Appellant,

and

MICHAEL MIGDAL, Individually and as
Conservator for the Estate of DANIEL MIGDAL,
a Protected Person,
     Defendant.

---

HARTFORD INSURANCE COMPANY OF THE
MIDWEST,
     Plaintiff-Appellee,

v                                  No. 133468

MICHIGAN CATASTROPHIC CLAIMS
ASSOCIATION,
     Defendant-Appellant.

---

BEFORE THE ENTIRE BENCH

YOUNG, J.

This Court must determine whether the Michigan Catastrophic Claims Association (MCCA) has authority to refuse to indemnify member insurers for unreasonable charges. In these consolidated appeals, the MCCA refused to indemnify its member insurers, United States Fidelity Insurance & Guaranty Company (USF&G) and Hartford Insurance Company of the Midwest (Hartford) (together, plaintiffs), for personal protection insurance (PIP) benefits[1] in excess of $250,000.[2] The MCCA claimed that the hourly rates for attendant care services agreed to by plaintiffs were unreasonable and that it was not required to reimburse member insurers for unreasonable payments. Plaintiffs argued that the MCCA lacked authority to refuse to indemnify their claims on the grounds that the charges they paid were unreasonable. We hold that when a member insurer's policy only provides coverage for "reasonable charges,"[3] the MCCA has authority to refuse to indemnify unreasonable charges. Accordingly, we reverse the judgment of the Court of Appeals and remand for further proceedings consistent with this opinion.

---

[1] "What are commonly called 'PIP benefits' are actually personal protection insurance (PPI) benefits by statute. However, lawyers and others call these benefits PIP benefits to distinguish them from property protection insurance benefits." *Roberts v Farmers Ins Exch*, 275 Mich App 58, 66-67 n 4; 737 NW2d 332 (2007) (citation omitted).

[2] See MCL 500.3104(2)(a).

[3] MCL 500.3107(1)(a).

2

## I. FACTUAL BACKGROUND

### A. *USF&G v MCCA, Docket No. 133466*

USF&G provided no-fault insurance coverage for Daniel Migdal, who was injured in a motor vehicle accident on August 22, 1981. Since his injury, Daniel has required 24-hour attendant care services.

In 1988, Daniel's father, Michael Migdal, individually and as conservator of Daniel's estate, filed a first party no-fault action against USF&G, seeking to recover attendant care benefits. In 1990, the parties entered into a consent judgment that provided that USF&G would pay $17.50 an hour for attendant care services with an adjustment for inflation of 8.5 percent compounded annually.[4]

The increased payments occasioned by this consent judgment have, in turn, driven this litigation. As of 2003, when this suit was filed, USF&G was paying $54.84 an hour to Medical Management, a company started by Mr. Migdal to provide his son's care. Medical Management paid the nurses who actually provided Daniel's care between $21.00 and $25.00 an hour plus benefits, which raised the average hourly nursing care cost to $32 an hour. As a result, the consent judgment created a profit center for Mr. Migdal. Medical Management kept the remainder of the hourly rate paid by USF&G and recovered approximately $200,000 in profits for 2003 for its operation.

---

[4] The adjustment was the result of extended negotiations and compromise. At the time of the settlement negotiations (the late 1980s), the cost of medical care was rising at a rate of over 10 percent annually.

The pay rate has continued to increase and, after Daniel's benefits exceeded the $250,000 MCCA statutory threshold,[5] USF&G sought indemnification from the MCCA under MCL 500.3104. The MCCA, however, refused to reimburse USF&G beyond $22.05 an hour, a rate that it considered reasonable.

### B. *Hartford v MCCA, Docket No. 133468*

Hartford provided no-fault insurance coverage for Robert Allen, who was injured in a motor vehicle accident on November 6, 2001. Allen was prescribed 24-hour attendant care services. Hartford initially paid for those services at the rate of $20 an hour.

In 2003, Allen retained an attorney and demanded that Hartford pay $37 an hour for attendant care services. The parties entered into a settlement agreement that provided that Hartford would pay $30 an hour for three years (May 6, 2003, to May 6, 2006).

Hartford sought indemnification from the MCCA under MCL 500.3104 because its payments to Allen exceeded the $250,000 threshold. The MCCA contested the reasonableness of the hourly rate and refused to reimburse Hartford beyond a rate of $20 an hour.

---

[5] MCL 500.3104(2)(a). The threshold has since been increased to $440,000. MCL 500.3104(2)(h).

## II. PROCEDURAL HISTORY

USF&G and Hartford each filed a complaint for a declaratory judgment against the MCCA.[6] Each plaintiff requested that the circuit court order the MCCA to reimburse the full rate of the attendant care services each insurer was paying its insured.

The parties filed motions for summary disposition under MCR 2.116(C)(9) and (10),[7] disputing whether the MCCA could refuse to reimburse payments that it deemed unreasonable. The circuit courts entered conflicting judgments. In USF&G's case, the court entered summary disposition in USF&G's favor. The court held that MCL 500.3104 does not include a reasonableness requirement and the court could not add one; thus, USF&G was entitled to summary disposition because the MCCA's argument lacked merit. In Hartford's case, the court denied Hartford's motion for summary disposition. The court held that the MCCA could

---

[6] USF&G also sought reformation of its consent judgment with Mr. Migdal. The court granted Mr. Migdal summary disposition under MCR 2.116(C)(8). USF&G did not file a claim of appeal from that order. Although Mr. Migdal filed a brief in this Court responding to this Court's order granting leave to appeal, see n 13 *infra*, the time for appealing the circuit court's order dismissing Mr. Migdal has expired, see MCR 7.205(F)(3), and Mr. Migdal is not a party to these proceedings.

[7] The court in USF&G's case declined to review the case under MCR 2.116(C)(9) because the parties relied on matters outside the pleadings. MCR 2.116(G)(5).

5

refuse to reimburse unreasonable charges and that whether the charges in that case were reasonable was a question of fact.[8]

The MCCA appealed the grant of summary disposition in USF&G's favor, and Hartford appealed the denial of its motion. The Court of Appeals consolidated the appeals and held that "the MCCA is statutorily required to reimburse an insurer for 100 percent of the amount that the insurer paid in PIP benefits to an insured in excess of the statutory threshold listed in MCL 500.3104(2), regardless of the reasonableness of these payments."[9] The Court of Appeals majority explained that "[a]lthough MCL 500.3105 and MCL 500.3107 indicate that an insurer is only required to reimburse an insured for reasonable charges, MCL 500.3104 does not include a reasonableness requirement."[10] Thus, the majority concluded that "MCL 500.3104 requires the MCCA to reimburse the insurer for the full amount (above the statutory threshold) of PIP benefits that the insurer is bound to pay to its insured, regardless of the circumstances under which that amount was determined, whether by agreement, judgment, binding arbitration, or

---

[8] Because USF&G's motion was granted before the court had ruled on Hartford's motion, the court in Hartford's case was aware of that ruling and distinguished USF&G's case as involving a consent judgment instead of a settlement agreement.

[9] *US Fidelity Ins & Guaranty Co v Michigan Catastrophic Claims Ass'n*, 274 Mich App 184, 192; 731 NW2d 481 (2007).

[10] *Id.* at 197.

otherwise, or the reasonableness of that amount."[11]   Accordingly, the Court of Appeals affirmed the grant of summary disposition in USF&G's favor, and reversed the denial of Hartford's motion.[12]

This Court granted the MCCA's applications for leave to appeal in both cases and asked the parties to address "whether MCL 500.3104(2) obligates the [MCCA] to reimburse member insurers' reimbursement claims without regard to the reasonableness of the member's payments to PIP claimants."[13]

_____

[11] *Id.*

[12] Judge White concurred and, noting that there were no allegations of bad faith by the insurers, added:

> Under the statutory framework, the determination of reasonableness is to be made by the insurer, or the judicial system after litigation. . . .  The statute does not contemplate that the MCCA will become a party to the insurance contract, or possible litigation, between the insured and the insurer, with a voice regarding whether a lesser or greater sum is reasonable under MCL 500.3107.  Nor does it contemplate that the MCCA will act as a de facto regulatory body, determining what amounts are reasonable for which services. [*Id.* at 205-206 (White, J., concurring).]

[13] *US Fidelity Ins & Guaranty Co v Michigan Catastrophic Claims Ass'n*, 481 Mich 862 (2008).  The order additionally asked the parties to consider:

> (1) Whether factors to consider in determining whether the MCCA is precluded from questioning the reasonableness of the reimbursement claims in these cases include the MCCA's failure to exercise to their full extent, before entry of the consent judgment in Docket No. 133466 and the settlement agreement in Docket No. 133468, its powers under MCL 500.3104(7)(b) and (g) to:
>
> (a) require notice of claims likely to involve the MCCA;

## III. STANDARD OF REVIEW

This Court reviews decisions to grant or deny summary disposition de novo.[14] Addressing the issues presented in this case requires that this Court interpret MCL 500.3104. Issues of statutory interpretation are questions of law that this Court reviews de novo.[15]

---

     (b) require notice of subsequent developments likely to materially affect the MCCA's interests;

     (c) establish claims procedures and practices for MCCA members; and,

     (d) if the MCCA considers a member's claims procedures and practices inadequate, to undertake to adjust or assist in adjusting the claim, at the member's expense, so as to ensure that member claims submitted to the MCCA for reimbursement are, in fact, reasonable; and

     (2) Whether, like the terms of declaratory judgments pertaining to PIP benefits payable in the future, the terms of consent judgments and settlement agreements pertaining to PIP benefits that embody terms that prove over time to call for reimbursement at a rate higher than the actual cost incurred are subject to:

     (a) reduction based on the requirement that an expense must be actually incurred before a no-fault insurer is obliged to pay it; and

     (b) redetermination from time to time of the amounts properly allowable, based on a change in facts or circumstances after entry of the consent judgment or settlement agreement. Cf. *Manley v DAIIE*, 425 Mich 140, 157 (1986); *Proudfoot v State Farm Mut Ins Co,* 469 Mich 476, 483-484 (2003).

[14] *Lash v Traverse City*, 479 Mich 180, 186; 735 NW2d 628 (2007).

[15] *Id*.

"When interpreting a statute, our primary obligation is to ascertain and effectuate the intent of the Legislature. To do so, we begin with the language of the statute, ascertaining the intent that may reasonably be inferred from its language."[16] "In interpreting the statute at issue, we consider both the plain meaning of the critical word or phrase as well as 'its placement and purpose in the statutory scheme.' As far as possible, effect should be given to every phrase, clause, and word in a statute."[17]

## IV. ANALYSIS

The parties dispute whether the MCCA may review the reasonableness of charges for attendant care services and refuse to indemnify a member insurer when it deems those charges unreasonable.

### A. *Whether the MCCA has authority to review and reject member claims*

The narrower threshold issue is whether the Legislature intended to permit the MCCA to conduct *any* review of claims submitted by member insurers. As stated, the language of the statute is the starting point to determine legislative intent. MCL 500.3104 does not expressly authorize the MCCA to review claims submitted by member insurers. MCL 500.3104(8)(g), however, does provide a broad grant of authority to the MCCA:

---

[16] *Id.* at 187.

[17] *Sun Valley Foods Co v Ward*, 460 Mich 230, 237; 596 NW2d 119 (1999) (citation omitted), quoting *Bailey v United States*, 516 US 137, 145; 116 S Ct 501; 133 L Ed 2d 472 (1995).

(8) In addition to other powers granted to it by this section, the association may do all of the following:

* * *

(g) Perform other acts not specifically enumerated in this section that are necessary or proper to accomplish the purposes of the association and that are not inconsistent with this section or the plan of operation.

Accordingly, the MCCA may perform any act "necessary or proper to accomplish" its purpose that is not inconsistent with § 3104 or its plan of operation.

This Court has explained the MCCA's purpose:

It was created by the Legislature in 1978 in response to concerns that Michigan's no-fault law provision for unlimited personal injury protection benefits placed too great a burden on insurers, particularly small insurers, in the event of "catastrophic" injury claims. Its primary purpose is to indemnify member insurers for losses sustained as a result of the payment of personal protection insurance benefits beyond the "catastrophic" level, which has been set at $250,000 for a single claimant. * * * In practice, the [MCCA] acts as a kind of "reinsurer" for its member insurers.[18]

---

[18] *In re Certified Question (Preferred Risk Mut Ins Co v Michigan Catastrophic Claims Ass'n)*, 433 Mich 710, 714-715 (1989). This Court further explained the policy underlying the statute:

The Legislature recognized that while such claims might be rare, they are also unpredictable, and equally as likely to strike a small or medium-sized insurer as they are a large insurer. The obvious problem is that the small or medium-sized companies have substantially fewer cars over which to spread the costs of potential losses, which means that the costs of providing unlimited medical and other benefits is higher per car for such companies, putting them at a competitive disadvantage in the state's insurance market. In addition to this competitive disadvantage, the Legislature considered the practical "business difficulties" confronting all insurers as a

10

Not every member insurer claim is entitled to indemnification under §

3104(2). Section 3104(2) obligates the MCCA to indemnify member insurers as

follows:

> The [MCCA] shall provide and each member shall accept indemnification for 100% of the amount of ultimate loss sustained under personal protection insurance coverages in excess of [$250,000].[19]

"Ultimate loss" is defined as "the actual loss amounts that a member is obligated

to pay and that are paid or payable by the member, and do not include claim

expenses."[20] Therefore, incorporating that definition, the statute provides that

"[The MCCA] shall provide and each member shall accept indemnification for

100% of the amount of [the actual loss amounts that a member is obligated to pay

---

> result of such possible catastrophic claims, such as the difficulty in determining the amount of reserves to keep on hand.
>
> It was thought that the creation of such an association of insurers would alleviate the competitive inequity of these catastrophic claims by spreading their cost throughout the industry, and also increase the statistical basis for prediction of the overall cost of such claims, making the management of these liabilities easier. See House Legislative Analysis, SB 306, March 13, 1978. [*In re Certified Question*, *supra* at 714 n 2.]

[19] The threshold loss amount is determined by the date the policy was issued or renewed. The subject policies of these appeals were "issued or renewed before July 1, 2002." MCL 500.3104(2)(a). Thus, the relevant threshold loss amount for these appeals is $250,000. *Id.* The current threshold is $440,000. MCL 500.3104(2)(h).

[20] MCL 500.3104(25)(c).

and that are paid or payable by the member] sustained under personal protection insurance coverages in excess of [$250,000]."

Each claim must meet the requirements of § 3104(2). First, the claim sought to be indemnified must be for the "ultimate loss," i.e., "the actual loss amounts that a member is obligated to pay and that are paid or payable by the member." Second, the claim must be "sustained under personal protection insurance coverages." And third, the loss must be in excess of the statutory threshold.[21] The MCCA's obligation to indemnify "100%" of the loss is not triggered unless the member insurer's claim meets all three requirements.

The Legislature has made policy judgments in setting out these requirements. It has determined that only certain, limited claims are "catastrophic" and require "reinsurance" to alleviate the burden placed on insurers providing no-fault coverage. Thus, it is "necessary or proper to accomplish the [MCCA's] purposes" and "not inconsistent with [§ 3104]" for the MCCA to review member insurer claims to ensure that they meet the requirements of § 3104(2).

Review of member insurer claims is also consistent with the MCCA's plan of operation, which, since its original plan of operation in 1978, has provided: "The Association shall, *upon verification of the propriety and amount of the*

---

[21] See MCL 500.3104(2)(a)-(k).

12

*payments made and the member's entitlement to reimbursement therefor*, reimburse the member the amount due it." (Emphasis added.)

Moreover, in *In re Certified Question (Preferred Risk Mut Ins Co v Michigan Catastrophic Claims Ass'n)*, this Court implicitly answered in the affirmative whether review of member claims is permitted.[22] There, the plaintiff, Preferred Risk, was a member insurer that insured an Illinois resident under a policy written in Illinois. The insured was catastrophically injured in an automobile accident in Michigan. The plaintiff sought indemnification for its losses in excess of the $250,000 statutory threshold.[23] The MCCA denied the plaintiff's application for indemnification on the basis that the insured was not a "resident."[24] This Court held that the indemnification requirement of § 3104(2) only applied to "a policy which was written in this state to provide the security required by § 3101(1) of the no-fault act . . . ."[25] Thus, this Court implicitly held

---

[22] *In re Certified Question*, *supra* at 723.

[23] MCL 500.3163(1) obligated the plaintiff to provide Michigan no-fault benefits.

[24] The MCCA defined "resident" as "all owners or registrants of motor vehicles required to be registered [in Michigan] . . . ." *In re Certified Question*, *supra* at 719.

[25] *Id.* This Court, determining that the statute controlled over the MCCA's definition of "resident," held that the statute nonetheless contained a parallel provision to the MCCA's definition of "resident." As we will discuss, this Court explained that "personal protection insurance coverages," as used in MCL 500.3104(2), refers to policies providing "the compulsory security requirements of [MCL 500.3101(1)]," i.e., "'residents,' in the language of the [MCCA's] plan of operation." *In re Certified Question*, *supra* at 723.

13

that the MCCA could review claims to determine whether the member insurer is entitled to indemnification because the Court endorsed the MCCA reviewing the residency of the insured.

In addition, *In re Certified Question* supports the proposition that the MCCA may refuse to indemnify claims that do not meet the requirements of § 3104(2).[26] Concomitant with the absence of an obligation to indemnify is the authority to act accordingly and reject claims that do not meet the requirements of § 3104(2). Indeed, such authority to reject is "necessary or proper to accomplish" the MCCA's purpose and not inconsistent with either § 3104 or the MCCA's plan of operation.

Accordingly, we hold that MCL 500.3104(8)(g) permits the MCCA to review claims submitted by member insurers and reject those that do not meet the requirements of § 3104(2). That leads to the dispositive issue whether that

---

[26] See also *Liberty Mut Ins Co v Michigan Catastrophic Claims Ass'n*, 248 Mich App 35, 42; 638 NW2d 155 (2001) (holding that the MCCA was not obligated to indemnify a claim under a California automobile insurance policy that was reformed into a Michigan no-fault automobile insurance policy five years after the subject accident, and stating that "the MCCA can refuse to indemnify claims paid under MCL 500.3163"); *Farmers Ins Exch v South Lyon Community Schools*, 237 Mich App 235, 238 n 1; 602 NW2d 588 (1999) ("[T]he MCCA is not obligated to indemnify its member insurers for amounts the insurers are not obligated to pay under their no-fault policies."); *Transamerica Ins Group v Michigan Catastrophic Claims Ass'n*, 202 Mich App 514; 509 NW2d 540 (1993) (holding that the MCCA was not obligated to indemnify a claim submitted by two insurers seeking to aggregate their shared losses to exceed the $250,000 threshold); *J C Penney Cas Ins Co v Michigan Catastrophic Claims Ass'n*, 177 Mich App 538 (1989), aff'd 434 Mich 901 (1990) (holding that the plaintiff insurer was not entitled to reimbursement from the MCCA).

authority permits the MCCA to review the reasonableness of charges for attendant care services and refuse to indemnify a member insurer when it deems those charges unreasonable.

*B. Whether the MCCA may review the reasonableness of attendant care charges and refuse to indemnify unreasonable charges*

Plaintiffs argue that § 3104(2) does not contain a "reasonableness" requirement and, instead, focus on the fact that they suffered an "actual loss" due to an "obligation." Plaintiffs also emphasize the term "100%" in § 3104(2) and argue that if the MCCA indemnifies less than the full amount of their claim, it is not meeting its statutory obligation.

Indeed, § 3104(2) does not contain the word "reasonable" or any variation thereof, and plaintiffs have paid their insureds subject to their obligations under a consent judgment and settlement agreement, respectively. Plaintiffs' arguments, however, ignore the second requirement of § 3104(2)—that the claim must be "sustained under personal protection insurance coverages."

In *In re Certified Question*, this Court held that

the reference to "personal protection insurance coverages" under which the [MCCA] may be liable for indemnification in the event of a catastrophic loss . . . is a shorthand reference to the no-fault personal protection insurance coverages that are generally the subject of the act, i.e., those which were written in this state to provide the compulsory security requirements of § 3101(1) of the no-fault act for the "owner or registrant of a motor vehicle required to be registered in this state" . . . .[27]

_____

[27] *In re Certified Question*, *supra* at 723. Plaintiffs argue that this statement is obiter dictum. "'Obiter dictum' is defined as '[a] judicial comment made during

15

Policies written in this state to provide the compulsory security requirements of § 3101(1) must comply with the provisions of the no-fault act. MCL 500.3105(1) obligates a member insurer to pay PIP benefits.[28] MCL 500.3107(1)(a) defines PIP benefits, in relevant part, as "[a]llowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation." Thus, a no-fault policy written in this state must, at a minimum, provide PIP benefits that include "*reasonable charges* incurred for reasonably

---

the course of delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential . . . .'" *People v Williams*, 475 Mich 245, 251 n 1; 716 NW2d 208 (2006), quoting Black's Law Dictionary (7th ed). As stated, *In re Certified Question* held that § 3104(2) only applied to "a policy which was written in this state to provide the security required by § 3101(1) of the no-fault act." *In re Certified Question*, *supra* at 719. The Court's interpretation of "personal protection insurance coverages" was not unnecessary. Rather, it directly reflects the holding.

The dissent cites *In re Certified Question* for several propositions of law, but distinguishes its holding. Despite conceding that § 3104(2) imposes three *requirements* that a member insurer's claim must meet, the dissent nonsensically asserts that the MCCA is without authority to determine whether a claim complies with § 3104(2). *Post* at 12 n 15. The dissent's position is fallacious on its face; it would rob any meaning from what the dissent concedes are requirements for indemnification. Moreover, the dissent attempts to limit the holding in *In re Certified Question* to noncompliance with § 3104(2) that is "objectively clear." *Post* at 13 n 15. Nothing in *In re Certified Question* suggests such a limitation. Rather, *In re Certified Question* plainly held that the MCCA is not required to indemnify a claim that does not meet the requirements of § 3104(2); we do the same today.

[28] MCL 500.3105(1) provides: "Under personal protection insurance an insurer is liable to pay benefits for accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle, subject to the provisions of this chapter."

16

necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation." It follows that the losses "sustained under personal protection insurance coverages" will *minimally* include "reasonable charges." Insurers are free to provide broader coverage and greater benefits than § 3107 provides.[29] Indeed, insurers may provide expanded coverage for actual or even unreasonable charges.[30] Thus, the member insurer's policy will ultimately control

---

[29] See *Cruz v State Farm Mut Auto Ins Co*, 466 Mich 588, 594; 648 NW2d 591 (2002) ("[W]here contract language is neither ambiguous, nor contrary to the no-fault statute, the will of the parties, as reflected in their agreement, is to be carried out, and thus the contract is enforced as written.").

[30] Of course, such practice may be subject to the MCCA's "takeover" authority under MCL 500.3104(7)(g), which provides:

> (7) The association shall do all of the following on behalf of the members of the association:
>
> * * *
>
> (g) Establish procedures for reviewing claims procedures and practices of members of the association. If the claims procedures or practices of a member are considered inadequate to properly service the liabilities of the association, the association may undertake or may contract with another person, including another member, to adjust or assist in the adjustment of claims for the member on claims that create a potential liability to the association and may charge the cost of the adjustment to the member.

The dissent asserts that § 3104(7)(g) authorizes the MCCA "to adjust *only* 'procedures and practices' of the member that produce an unreasonable payment amount; the power does not include the power to adjust the amount." *Post* at 20. Section 3104(7)(g) permits the MCCA "to adjust or assist in the adjustment of *claims* for the member on claims that create a potential liability to the association . . . ." (Emphasis added.) As used in § 3104(7)(g), "adjust" means "[t]o settle or arrange; to free from differences or discrepancies. To bring to

17

the standard for the MCCA's review because the policy establishes the "personal protection insurance coverages."[31]

Whether the subject charges fall within the terms of the individual policies that covered Daniel Migdal and Robert Allen is not before this Court. The parties

satisfactory state so that parties are agreed, as to adjust amount of loss by fire or controversy regarding property or estate. . . . Determination of amount to be paid to insured by insurer to cover loss or damage sustained." Black's Law Dictionary (5th ed); see also *Random House Webster's College Dictionary* (1997) ("to determine the amount to be paid in settlement of (an insurance claim)"). Contrary to the dissent's assertion, the MCCA's authority is not limited to adjusting the member insurer's "procedures and practices"; the MCCA is authorized to negotiate directly with the insured to reach a settlement of the claim and, under those circumstances, the MCCA is "adjusting" the amount. When it "adjusts" a claim, the MCCA is seeking to reduce its liability by preventing the member insurer from accepting excess liability. Invariably any adjustment will depend on the terms of the policy.

The instant cases are distinct from the norm, however. Here, plaintiffs agreed to certain payments in a consent judgment and a settlement agreement and remain bound by those agreements regardless whether the MCCA indemnifies the entire claim or invokes its "takeover" authority. Although member insurers are not "obligated" to pay their insureds until the claimed expense is actually incurred, see *Proudfoot v State Farm Mut Ins Co*, 469 Mich 476, 484 (2003), any opportunity to "adjust" Daniel's and Allen's claims and thereby reduce plaintiffs' liability before they become obligated is severely limited by the terms of their agreements.

[31] The dissent contends that the consent judgment and settlement agreement became "part of the insurer's coverage." *Post* at 12. The dissent's attempt to bootstrap the terms of the consent judgment and settlement agreement into the insureds' coverages is inconsistent with the dissent's own definition of "coverage," and is unpersuasive. We agree with the dissent that "'coverage' refers to protection afforded by an insurance policy or the sum of risks assumed by an insurance policy." *Jarrad v Integon Nat'l Ins Co*, 472 Mich 207, 217; 696 NW2d 621 (2005), citing *LeBlanc v State Farm Mut Auto Ins Co*, 410 Mich 173, 204; 301 NW2d 775 (1981). Thus, the terms of the *policy* control the standard for the MCCA's review.

18

have not litigated that issue and we are without the facts necessary to resolve it. The issue before this Court is whether the requirement that member insurer claims be "sustained under personal protection insurance coverages" entitles the MCCA to refuse to indemnify unreasonable charges. We hold that when a member insurer's policy provides coverage only for "reasonable charges," the MCCA has authority to refuse to indemnify unreasonable charges. If the policy provides broader coverage, the MCCA must review for compliance with the broader coverage and indemnify claims within that coverage, but it may reject claims in excess of that coverage. Claims in excess of the member insurer's PIP coverages are not "sustained under personal protection insurance coverages." Thus, those claims do not meet the three statutory requirements of § 3104(2) and they do not trigger the MCCA's obligation to indemnify "100%" of the claimed loss. Rather, the MCCA is only obligated to indemnify "100%" of the portion of the claimed loss that meets all three requirements of § 3104(2). Accordingly, we remand these cases to the trial court to determine the PIP coverages provided by the individual policies at issue in these cases and, if appropriate, whether the attendant care charges were reasonable.[32]

---

[32] Each party advances a policy argument in its favor. The MCCA argues that the no-fault system is intended keep automobile insurance costs affordable. See *Cameron v Auto Club Ins Ass'n*, 476 Mich 55, 71-72; 718 NW2d 784 (2006) ("[A] dominant legislative purpose permeating throughout the no-fault act is to ensure that this mandatory coverage is affordable."). The premium the MCCA charges a member insurer is passed on to its insureds. See *In re Certified Question*, *supra* at 729; MCL 500.3104(22). As a result, the MCCA argues, if the

## V. CONCLUSION

All member insurer claims must meet certain requirements of § 3104(2) to be entitled to indemnification from the MCCA. The MCCA may review those claims for compliance with § 3104(2) because such review is "necessary or proper to accomplish" the MCCA's purpose and is not inconsistent with § 3104 or the MCCA's plan of operation.[33] The MCCA may additionally reject claims that do not meet the requirements of § 3104(2).[34] One such requirement is that the

_____

MCCA must incur significant additional liability for "unreasonable charges," no-fault insurance costs will rise dramatically. In response, plaintiffs argue that no-fault insurance was intended to provide assured, adequate, and prompt payment. See *Shavers v Attorney General*, 402 Mich 554, 579-580; 267 NW2d 72 (1978) ("The goal of the no-fault insurance system was to provide victims of motor vehicle accidents assured, adequate, and prompt reparation for certain economic losses."); MCL 500.3142. Plaintiffs argue that if the MCCA may reject member insurer claims on the basis of the reasonableness of the charges, member insurers will need to seek assurances that the MCCA will reimburse certain payments before making them; thus, delaying payment.

Both policy arguments are compelling. It is not for this Court, however, to favor one policy objective over the other. "[P]olicy decisions are properly left for the people's elected representatives in the Legislature, not the judiciary. The Legislature, unlike the judiciary, is institutionally equipped to assess the numerous trade-offs associated with a particular policy choice." *Devillers v Auto Club Ins Ass'n*, 473 Mich 562, 589; 702 NW2d 539 (2005). The Legislature has made its policy choice. Given the text of MCL 500.3104(2), we believe that the Legislature intended to allow the MCCA to reject claims for charges in excess of the member's policy coverage. Thus, the parties' competing policy arguments are misplaced because this Court is without authority to replace the Legislature's choice with our own.

[33] MCL 500.3104(8)(g).

[34] *Id.*

claimed loss must be "sustained under personal protection insurance coverages."[35] A loss "sustained under personal protection insurance coverages" is one sustained under a policy providing "the compulsory security requirements of § 3101(1) . . . ."[36] Under § 3107(1)(a), such policies minimally include "*reasonable charges* incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation." When a member insurer's policy provides coverage consistent with MCL 500.3107(1)(a), the MCCA has authority to refuse to indemnify unreasonable charges. If the policy provides broader coverage, the MCCA may refuse to indemnify only charges in excess of that broader coverage.

We reverse the judgment of the Court of Appeals and remand these cases to the circuit court for proceedings consistent with this opinion.

Robert P. Young, Jr.
Clifford W. Taylor
Maura D. Corrigan
Stephen J. Markman

---

[35] MCL 500.3104(2).

[36] *In re Certified Question*, *supra* at 723.

21

S T A T E   O F   M I C H I G A N

SUPREME COURT

UNITED STATES FIDELITY INSURANCE &
GUARANTY COMPANY,
      Plaintiff-Appellee,

v                                               No. 133466

MICHIGAN CATASTROPHIC
CLAIMS ASSOCIATION,
      Defendant-Appellant,

and

MICHAEL MIGDAL, Individually and
as Conservator for the Estate of DANIEL
MIGDAL, a Protected Person,
      Defendant.
_____

HARTFORD INSURANCE COMPANY
OF THE MIDWEST,
      Plaintiff-Appellee,

v                                               No. 133468

MICHIGAN CATASTROPHIC
CLAIMS ASSOCIATION,
      Defendant-Appellant.
_____

MARKMAN, J. (*concurring*).

Although I fully agree with the majority opinion, I write separately to address what I think is its failure to fully explain why its definition of "personal insurance protection coverages," which is limited to a member insurer's initial insurance *policy*, is required by the statute. If the majority's definition is correct,

the MCCA will often be allowed to review member claims for reasonableness because the policy itself will often limit claims to "reasonable" costs.[1] On the other hand, if the dissent is correct that settlement agreements and consent judgments are part of a member insurer's "coverages," and indeed may effectively become part of a member's "policy," then the MCCA will only rarely be allowed to review claims for reasonableness. The question then posed is which of these interpretations of "personal insurance protection coverages" is to be preferred under the law. In my view, the majority's assertion that "coverages" refers to the "policy," although ultimately the better definition, requires additional legal analysis.

The disputed statutory provision, MCL 500.3104(2), provides that "[the MCCA] shall provide and each member shall accept indemnification for 100% of the amount of the ultimate loss sustained under personal protection insurance coverages in excess of the [statutory threshold.]" In interpreting this language, our primary goal is to ascertain and give effect to the Legislature's intent. *McClellan v Collar (On Remand)*, 240 Mich App 403, 409; 613 NW2d 729 (2000). "As far as possible, effect should be given to every phrase, clause, and word in the

---

[1] The dissent is correct that the reasonableness requirement of MCL 500.3107 is not integrated into the indemnification clause set forth in § 3104(2). *Post* at 22. However, the majority opinion does not attempt to incorporate this requirement into the MCCA's statutory power to review a member insurer's claim to ensure it is in compliance with the policy. Rather, it holds that the MCCA can review a member's claim for compliance *with the policy*, which, as represented by both parties, generally includes a requirement that member insurers reimburse only *reasonable* claims based on § 3107.

2

statute." *Sun Valley Foods Co v Ward*, 460 Mich 230, 237; 596 NW2d 119 (1999).

> Here, the dissent has defined "coverages," in MCL 500.3104(2), as follows:

> > Under the common meaning of "coverage," the contractual liability amount that an insurer agrees to pay an insured is considered a part of the insurer's coverage. [Black's Law Dictionary (5th ed).] USF&G and Hartford paid funds pursuant to a consent judgment and a settlement agreement with the respective insureds. This contractual liability, or coverage, owed by each insurer is the total amount agreed to between the original contracting parties. [*Post* at 12-14.]

Thus, the issue becomes whether "coverages" includes *any* contractual liability, which is properly insurable under the act, that a member insurer incurs at *any time*. The answer lies, I believe, in MCL 500.3104(7)(d), which requires that the MCCA,

> [i]n a manner provided for in the plan of operation, calculate and charge to members of the [MCCA] a total premium sufficient to cover the expected losses and expenses of the [MCCA] that the [MCCA] will likely incur during the period for which the premium is applicable.

This provision requires the MCCA to calculate premiums that it will charge to member insurers on the basis of the losses and expenses that the MCCA expects to incur. A principal component of this calculation is the frequency with which the MCCA will be required to reimburse member insurers for catastrophic claims, and for what amounts. Significantly, if a policy only requires a member insurer to pay "reasonable" claims, then the MCCA will charge a lower premium.

3

This conclusion is supported by two observations, which both assume a member's policy only requires "reasonable" payments in accordance with MCL 500.3107. First, where a member insurer only pays "reasonable" claims, a member will incur fewer claims that meet the catastrophic threshold for which the MCCA is required to provide reimbursement. Second, the MCCA will anticipate that, when a catastrophic claim *does* occur, any amount in excess of the statutory threshold will also be "reasonable." In other words, the MCCA's liability for reasonable claims will clearly be less than payments for unreasonable claims. As a result, the MCCA will charge a lower premium to member insurers if those member insurers pay only "reasonable" claims because the MCCA's "expected losses and expenses" will be less. Most importantly, the MCCA will only be able to determine the appropriate premiums that its member insurers must pay on the basis of their original policies.

The real question of interest then becomes what effect a subsequent settlement agreement or consent judgment that requires an arguably *unreasonable* payment will have on the MCCA's responsibility to reimburse claims under the original insurance policy for which it has already calculated and charged its premium. This depends on what, if any, effect these agreements have on the original policy. There are two plausible interpretations of what these types of agreements seek to accomplish. The first is that these are entirely new contracts, for which the member insurers have paid no premiums as contemplated by MCL 500.3104(7)(d). Under this interpretation, the member insurer will not have

4

complied with the statute and will not be entitled to reimbursement from the MCCA. The second interpretation is that these agreements alter or modify the existing policy by further defining that policy's pre-existing terms (i.e., what is meant by the policy's requirement that a member insurer pay reasonable personal protection insurance benefits, as required by MCL 500.3107). Under this latter interpretation, if a settlement agreement purports to alter or modify the original policy, then the member insurer will have paid premiums to the MCCA *before* the accident has occurred. However, any such alteration or modification to a pre-existing policy cannot reasonably increase the MCCA's liability because a member will only have paid premiums based on the MCCA's assessment of the initial policy.

*Liberty Mut Ins Co v Michigan Catastrophic Claims Ass'n*, 248 Mich App 35; 638 NW2d 155 (2002), is instructive on this point. *Liberty Mut* examined a situation in which a member insurer had an insurance policy with an out-of-state driver who subsequently moved to Michigan and catastrophically injured a Michigan resident. The member insurer paid personal protection insurance benefits to the injured Michigan resident based on the out–of-state driver's policy, even though that policy at the time of the accident was *not* a Michigan policy. However, in order to be eligible for MCCA reimbursement, the member insurer attempted to retroactively reform its policy, including remitting unpaid premiums, so as to comply with MCL 500.3104 before submitting its claim to the MCCA.

5

Nevertheless, the MCCA rejected the member insurer's claim, and the Court of Appeals agreed, stating:

> If we were to accept plaintiff's argument, we would set a precedent by which an insurer could withhold premium payments for policyholders who moved to Michigan, then, upon a loss exceeding $250,000, the insurer could simply reform the contract, submit the previously due premium payments, and be reimbursed for claims paid in excess of $250,000. Under that situation, the MCCA would be deprived of premiums for policies on which no claims are made, thus defeating the "spread the risk" concept in insurance. [*Id*. at 47.]

This rationale applies with equal force to settlement agreements and consent judgments that attempt to retroactively increase the scope of a policy's coverage even *after a member insurer has paid its premiums* to the MCCA. Although the member insurers in the instant consolidated cases have paid part of their premiums to the MCCA, they have, in one sense, effectively "misrepresented" to the MCCA what amounts they would pay to their insured drivers in the event of a catastrophic claim. A member insurer that informs the MCCA that it will only pay "reasonable" claims, but then subsequently modifies the policy after the accident occurs to include unreasonable claims, has essentially sought reimbursement for claims for which it has not paid premiums.

Additionally, unlike the member insurer in *Liberty Mut*, the member insurers in this case sought to reform the policy without even purporting to pay the premiums that would have been owed. Such a practice defeats the very purpose of MCL 500.3104(7)(d) by denying the MCCA the opportunity to impose a properly calculated premium, which is essential to the MCCA's ability (or indeed any

6

insurer's ability) to collect sufficient premiums to further its "risk spreading" function.  This is clearly contrary to the language of MCL 500.3104(7)(d), which requires the MCCA to impose a premium on a member insurer that is "sufficient to cover the expected losses and expenses of the [MCCA] that the [MCCA] will likely incur during the period for which the premium is applicable."  As a result, the majority, in my judgment, correctly concludes that the statute requires that the original policy determine the MCCA's reimbursement responsibilities.

Stephen J. Markman

S T A T E   O F   M I C H I G A N

SUPREME COURT

UNITED STATES FIDELITY
INSURANCE & GUARANTY
COMPANY,
         Plaintiff-Appellee,

v                                     No. 133466

MICHIGAN CATASTROPHIC CLAIMS
ASSOCIATION,
         Defendant-Appellant,

and

MICHAEL MIGDAL, Individually and as
Conservator for the Estate of DANIEL
MIGDAL, a Protected Person,
              Defendant.

_____

HARTFORD INSURANCE COMPANY
OF THE MIDWEST,
         Plaintiff-Appellee,

v                                     No. 133468

MICHIGAN CATASTROPHIC CLAIMS
ASSOCIATION,
         Defendant-Appellant.

_____

WEAVER, J. (*dissenting*).

This Court granted leave to appeal to consider whether MCL 500.3104(2) obligates the Michigan Catastrophic Claims Association (MCCA) to reimburse a member insurer for personal protection insurance (PIP) benefits paid to a claimant

without regard to the reasonableness of the member insurer's payments of PIP benefits.

I dissent and would hold that the indemnification obligation set forth in MCL 500.3104(2) does not incorporate the reasonableness standard that MCL 500.3107 requires between claimants and member insurers. Furthermore, the powers granted to the MCCA in § 3104(7) are limited to adjusting the "practices and procedures" of the member insurers and do not encompass adjustment to the payment amount agreed to between claimants and member insurers. Moreover, I would hold that the power granted to the MCCA under MCL 500.3104(8)(g) is limited to furthering the purposes of the MCCA, and that determining reasonableness is not one of its purposes. Finally, although the MCCA has no right to directly challenge the reasonableness of a claim, the no-fault statute does provide the MCCA with safeguards against negligent actions of member insurers. Accordingly, I would affirm the judgment of the Court of Appeals.

## I. FACTS AND PROCEDURAL HISTORY

### *United States Fidelity Insurance & Guaranty Co v MCCA*

In the first case in these consolidated appeals, Daniel Migdal was injured in a 1981 car accident in which he incurred catastrophic injuries. His injuries included a traumatic brain injury with cerebral spastic quadriplegia, severe oral motor apraxia, and dysphasia. Because of the extent of the injuries, Daniel was prescribed, and received, 24-hour-a-day nursing care. In 1988, Michael Migdal

2

(Mr. Migdal), Daniel's father and the conservator of Daniel's estate, sued the no-fault insurance provider, United States Fidelity Insurance & Guaranty Company (USF&G), to recover expenses paid for Daniel's care. In 1990, the parties entered into a consent judgment. Pursuant to the judgment, USF&G paid Mr. Migdal $35,000 in exchange for a release from all contractual liability for nursing care provided before May 10, 1989. Additionally, USF&G agreed to pay $17.50 an hour for Daniel's home nursing care for the following year.[1] The payments would be rendered regardless of whether Daniel's parents provided the nursing care or a third party was brought in to provide the care. The hourly rate, fixed for the first year after the judgment, was subject to an annual increase of 8.5%. The increased rate would be compounded based on the previous year's rate.

Pursuant to the consent judgment, USF&G paid Mr. Migdal the consented-to hourly wage.[2] Once the amount paid to Mr. Migdal had reached the statutory threshold amount of $250,000,[3] the MCCA began to reimburse USF&G for

---

[1] Mr. Migdal created a company to manage Daniel's care. This company acted as an intermediary using the benefit payments from USF&G to pay the hired nurses that cared for Daniel and to pay Mr. Migdal for his efforts in Daniel's care. The judgment contained the caveat that if Daniel's condition substantially changed, the court retained jurisdiction and could determine whether a reduction or increase in the payments was "warranted."

[2] Mr. Migdal testified that his duties included reading papers concerning business management and medical advances, checking and providing maintenance of Daniel's equipment, keeping the books, paying the nurses, and shopping for necessary items for Daniel's care.

[3] MCL 500.3104(2) reads, in pertinent part:

3

payments made to Mr. Migdal that exceeded the threshold. However, the MCCA ultimately refused to reimburse USF&G for the amount over $250,000 that USF&G paid Mr. Migdal under the consent judgment. In 2003, USF&G filed a complaint in the Oakland Circuit Court for a declaratory judgment that the MCCA must reimburse USF&G for the total amount that USF&G paid to Mr. Migdal under the consent judgment, regardless of the reasonableness of the amount. At the time, USF&G was paying $54.84 an hour to Mr. Migdal for Daniel's nursing care.[4] The MCCA sought to only be required to reimburse USF&G at a rate of $22.05 an hour, arguing that the agreed-upon rate of $54.84 an hour was unreasonable and, therefore, the MCCA should not have to reimburse USF&G for the total amount. Meanwhile, USF&G sought to have the consent judgment with Mr. Migdal revised, arguing that circumstances changed when Mr. Migdal hired a third party to care for Daniel instead of providing the nursing care himself. Mr.

---

> [T]he association shall provide and each member shall accept indemnification for 100% of the amount of ultimate loss sustained under personal protection insurance coverages in excess of the following amounts in each loss occurrence . . . .

At the time of both accidents involved in these consolidated appeals, the threshold amount was $250,000.

[4] Mr. Migdal paid $32 an hour of this amount to the nurses (including benefits), and Mr. Migdal kept the rest as compensation for his work.

4

Migdal filed a motion for summary disposition for failure to state a claim. The court granted Mr. Migdal's motion.[5]

Likewise, the MCCA made a motion for summary disposition. It contended that there was no question of material fact that the payments made by USF&G to Mr. Migdal were unreasonable. Moreover, the MCCA argued that the no-fault act only required reimbursement of payments that are reasonable. In a countermotion for summary disposition, USF&G argued that the no-fault act required the MCCA to reimburse it for the full amount paid to Mr. Migdal, despite any unreasonableness regarding the amount paid. Alternatively, USF&G argued that there was a question of material fact concerning the "unreasonableness" of the consent judgment.

The trial court granted USF&G's motion for summary disposition, ruling that the MCCA must reimburse USF&G for its "ultimate loss,"[6] which includes the entire amount that USF&G had to pay Mr. Migdal regardless of whether the amount paid was reasonable. The trial court denied the MCCA's motion for summary disposition. The trial court entered a judgment requiring the MCCA to reimburse USF&G in the amount of $1,725,072 under the no-fault act and holding the MCCA liable for future payments consistent with the consent judgment. The

---

[5] USF&G did not appeal this decision. I therefore express no opinion on whether the consent judgment would have been subject to judicial modification on the ground that the payment amount it called for had become unreasonable with the passage of time.

[6] MCL 500.3104(2).

5

parties agreed to stay the enforcement of the order while the MCCA appealed by right in the Court of Appeals.

*Hartford Ins Co v MCCA*

In the second case of these consolidated appeals, Robert Allen was injured in a 2001 car accident in which he incurred catastrophic injuries. His injuries included right-sided pleuritic effusion, brain injuries, quadriparesis, bilateral frozen shoulder, and cardiopathy. Because of the extent of the injuries, Allen was prescribed, and received, 24-hour-a-day care by a licensed nurse. Hartford Insurance Company of the Midwest (Hartford), Allen's no-fault insurer, initially paid $20 an hour for the nurse. In 2003, Hartford agreed to pay an increased rate of $30 an hour for Allen's care. Soon thereafter, Hartford's payments for Allen's care exceeded the $250,000 statutory threshold.

The MCCA refused to reimburse Hartford for any payments above $20 an hour for the services rendered. Hartford filed a complaint for a declaratory judgment that would require the MCCA to pay Hartford $571,847.21 as reimbursement for payments exceeding the no-fault threshold. Additionally, Hartford sought a declaration that the MCCA must reimburse Hartford for the total payments above the $250,000 threshold, regardless of the reasonableness of the payments. After the initial filing, Hartford moved for summary disposition, arguing that the no-fault act required the MCCA to reimburse Hartford for the entire amount paid to Allen that exceeded the threshold, regardless of the reasonableness of that amount. The MCCA argued that it only had to reimburse

6

Hartford for reasonable payments and that there was insufficient discovery concerning the reasonableness of the amount of the payments. The circuit court judge ruled that reasonableness was an element in determining how much the MCCA must reimburse Hartford and that there was insufficient discovery to determine if the payments were reasonable. Hartford immediately appealed the trial court's holding requiring the element of reasonableness to be considered.

### The Court of Appeals Decision

The Court of Appeals consolidated the USF&G and Hartford cases and held that "*MCL 500.3104* does not incorporate a 'reasonableness' requirement and requires the MCCA to reimburse insurers for the *actual* amount of PIP benefits paid in excess of the statutory threshold."[7] (Emphasis in the original). The MCCA sought leave to appeal in this Court, and this Court granted leave.[8]

### II. STANDARD OF REVIEW

Statutory interpretation is a question of law, which this Court reviews de novo. *In re Investigation of March 1999 Riots in East Lansing (People v Pastor)*, 463 Mich 378, 383; 617 NW2d 310 (2000). This Court reviews de novo a trial court's decision regarding a motion for summary disposition. *Herald Co v Bay City,* 463 Mich 111, 117; 614 NW2d 873 (2000).

---

[7] *United States Fidelity Ins & Guaranty Co v Michigan Catastrophic Claims Ass'n*, 274 Mich App 184, 192; 731 NW2d 481 (2007).

[8] 481 Mich 862 (2008).

### III. ANALYSIS

The issue before this Court involves how much of a member insurer's coverages the MCCA must indemnify in the event of a catastrophic injury. Specifically, is the MCCA liable for reimbursement of PIP payments based on potentially unreasonable claims?

The outcome of these cases depends on this Court's interpretation of the language in MCL 500.3104. An overarching rule of statutory construction is "that this Court must enforce clear and unambiguous statutory provisions as written." *In re Certified Question Preferred Risk Mut Ins Co v Michigan Catastrophic Claims Ass'n*, 433 Mich 710, 721; 449 NW2d 660 (1989) (internal quotations omitted). "If the language of [a] statute is unambiguous, the Legislature must have intended the meaning clearly expressed, and the statute must be enforced as written." *Sun Valley Foods Co v Ward*, 460 Mich 230, 236; 596 NW2d 119 (1999). However, "what is 'plain and unambiguous' often depends on one's frame of reference." *Shiffer v Gibraltar School Dist Bd of Ed*, 393 Mich 190, 194; 224 NW2d 255 (1974). In order to ascertain this frame of reference, the contested provisions must be read in relation to the statute as a whole and work in mutual agreement. *In re Certified Question*, 433 Mich at 722. See also *State Treasurer v Wilson*, 423 Mich 138, 144; 377 NW2d 703 (1985).

Additionally, the frame of reference shares a deep nexus with the intent of the Legislature. "The primary goal of statutory interpretation is to give effect to

8

the intent of the Legislature." *Title Office, Inc v Van Buren Co Treasurer*, 469 Mich 516, 519; 676 NW2d 207 (2004), quoting *In re MCI Telecom Complaint*, 460 Mich 396, 411; 596 NW2d 164 (1999). Fundamentally, "[t]his task begins by examining the language of the statute itself. The words of a statute provide the most reliable evidence of [the Legislature's] intent . . . ." *Sun Valley*, 460 Mich at 236 (internal citation and quotation marks omitted). This Court must "consider both the plain meaning of the critical word or phrase as well as 'its placement and purpose in the statutory scheme.'" *Id*. at 237, quoting *Bailey v United States*, 516 US 137, 145; 116 S Ct 501; 133 L Ed 2d 472 (1995). "As far as possible, effect should be given to every phrase, clause, and word in the statute. The statutory language must be read and understood in its grammatical context, unless it is clear that something different was intended." *Sun Valley*, 460 Mich at 237.

In interpreting § 3104, this Court first must determine how § 3104(2) corresponds with § 3107 and how these two provisions correspond within the scheme of the entire statute. Section 3104(2) requires that the MCCA "shall provide and each member shall accept indemnification for 100% of the amount of ultimate loss sustained under personal protection insurance coverages in excess of the following amounts in each loss occurrence . . . ."[9] Section 3107(1)(a) defines "personal protection insurance *benefits*" as "[a]llowable expenses consisting of all

---

[9] The amounts are statutorily set to increase over time. At the time of both accidents, the threshold amount was $250,000. In 2008, the threshold amount is $440,000. See MCL 500.3104(2)(a)-(k).

reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery or rehabilitation." This provision requires that all PIP benefits claimed and paid between the insurer and the insured must be reasonable. The MCCA argues that this Court should incorporate the § 3107 definition of "benefits" into § 3104(2) where § 3104(2) refers to "coverages." However, I would decline to do so because the phrase "personal protection insurance *benefits*" has a distinct meaning from the phrase "personal protection insurance *coverages*" that is found in § 3104(2).

When the Legislature uses different words, the words are generally intended to connote different meanings. Simply put, "the use of different terms within similar statutes generally implies that different meanings were intended." 2A Singer & Singer, Sutherland Statutory Construction (7th ed), § 46:6, p 252. If the Legislature had intended the same meaning in both statutory provisions, it would have used the same word. This construction rule is the corollary to the rule that "words used in one place in a statute have the same meaning in every other place in the statute." *Little Caesar Enterprises v Dep't of Treasury*, 226 Mich App 624, 630; 575 NW2d 562 (1997). Therefore, I disagree with the MCCA and would hold that the definition of personal protection insurance *benefits* found in § 3107(1)(a) (including the reasonableness standard) is not equivalent to the definition of personal protection insurance *coverages* in § 3104(2).

The distinctive use of the term "coverages" is important. *LeBlanc v State Farm Mut Auto Ins Co*, 410 Mich 173, 204; 301 NW2d 775 (1981) ("'Coverage',

10

a word of precise meaning in the insurance industry, refers to protection afforded by an insurance policy, or the sum of the risks assumed by a policy of insurance."). Although the terms "benefits" and "coverages" are related because of their close proximity in the statute,[10] the proximity of these two terms does not mean that they are synonymous.

Section 3107 excludes from the definition of "allowable expenses" within PIP "coverages" hospital charges in excess of reasonable and customary semi-private room charges and funeral and burial expenses in amounts specified in the policy (subject to a range specified in that section). This leaves all other charges open to PIP "coverage." The fact that the Legislature limited the exceptions to "coverage" so narrowly indicates that the term "coverage" is a broader term than "benefits." Moreover, since "coverages" is never given a more restrictive definition elsewhere in the statute, the word must be afforded its ordinary everyday meaning. *Sun Valley*, 460 Mich at 237 ("The statutory language must

---

[10] MCL 500.3107(1) provides, in pertinent part:

> Except as provided in subsection (2), personal protection insurance *benefits* are payable for the following:

> (a) Allowable expenses consisting of all reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation. Allowable expenses within personal protection insurance *coverage* shall not include charges for a hospital room in excess of a reasonable and customary charge for semiprivate accommodations . . . or for funeral and burial expenses in the amount set forth in the policy which shall not be less than $1,750.00 or more than $5,000.00. (Emphasis added.)

11

be read and understood in its grammatical context, unless it is clear that something different was intended."). In the grammatical context, the meaning of "coverages" is its common meaning, limited only by the specific statutory exceptions.

"Coverage" is defined in dictionaries as the "[e]xtent of protection afforded by an insurance policy [or the] amount of funds reserved to meet liabilities,"[11] as "protection against a risk or risks specified in an insurance policy,"[12] as "the risks within the scope of an insurance policy,"[13] and as the "amount and extent of risk covered by insurer."[14] Under the common meaning of "coverage," the contractual liability amount that an insurer agrees to pay an insured is considered a part of the insurer's coverage.[15] USF&G and Hartford paid funds pursuant to a

---

[11] *Webster's II New College Dictionary* (1995).

[12] *Random House Webster's Dictionary* (2001).

[13] Black's Law Dictionary (7th ed).

[14] Black's Law Dictionary (5th ed).

[15] I agree with the majority insofar as it concludes that the MCCA was required to indemnify the insurer for (1) the ultimate loss; (2) sustained under personal protection insurance coverages; and (3) in excess of the statutory threshold. However, the majority erroneously limits the term "coverages" by incorporating into its definition the reasonableness requirement for "benefits" found in § 3107. However, as the various definitions of "coverage" reveal, "coverages" is not such a specific term that it can be limited to the amount of "benefits" payable under a policy. Rather, "coverages" is a broad term that applies to different categories of risks. Hence, the Legislature used "benefits" and "coverages" as distinct terms with distinct meanings. By incorporating the reasonableness requirement of "benefits" into "coverages," the majority blurs the meaning of the terms and ignores the broad common meaning of "coverages."

12

consent judgment and a settlement agreement with the respective insureds.  This

contractual liability, or coverage, owed by each insurer is the total amount agreed

---

The majority opinion relies significantly on language from *In re Certified Question* that limits the indemnification requirement of § 3104(2) to "a policy which was written in this state to provide the compulsory security requirements of § 3101(1) of the no-fault act for the 'owner or registrant of a motor vehicle required to be registered in this state.'" *In re Certified Question*, 433 Mich at 723. The majority seizes on this language as "implicitly" holding that the MCCA may review claims to determine whether members are entitled to indemnification.

The majority's reliance on *In re Certified Question* in this case is flawed. First, it notes that the *In re Certified Question* Court allowed the MCCA to determine whether the insured was a "resident" of the state.  Once the residency question was resolved, the Court determined that the MCCA was not required to indemnify the insurer because § 3104(2) does not apply to PIP payments to nonresidents.  Therefore, the benefits at issue in *In re Certified Question* were paid pursuant to the requirements of § 3163 of the no-fault act, not § 3101.  By contrast, the policies at issue here clearly were written to provide the security required by § 3101.  *In re Certified Question* at most only gave the MCCA the authority to reject indemnification for benefits paid to nonresidents under § 3163. Thus, to the extent that the majority opinion relies on *In re Certified Question* as determinative here, it errs.  The majority goes too far by endorsing an extension of the holding of *In re Certified Question* to allow the MCCA to resolve *any* question about whether § 3104(2) applies.

Further, in *In re Certified Question*, once the residency question was answered, it was objectively clear from the statutory language that § 3104(2) did not apply.  In contrast, in this case the majority extends the reasoning of *In re Certified Question* to allow the MCCA to make subjective "reasonableness" determinations about the insurer's payment of PIP benefits.  Yet nothing in the statutory scheme explicitly gives the MCCA the authority to make such a determination.  The majority claims that "[c]oncomitant with the absence of an obligation to indemnify is the authority to act accordingly and reject claims that do not meet the requirements of § 3104(2)." *Ante* at 14.  I disagree.  Again, *In re Certified Question* only relieved the MCCA of its obligation to indemnify benefits paid under § 3163.  *In re Certified Question* did not, explicitly or implicitly, grant the MCCA additional authority beyond the authority granted to it by the plain language of the statute.

13

to between the original contracting parties. The reasonableness of the agreed payment amount is not a factor.

The meaning of "coverages" in MCL 500.3107 becomes clearer after considering "'its placement and purpose in the statutory scheme.'" *Sun Valley*, 460 Mich at 236, quoting *Bailey*, 516 US at 145. In the statute, "coverages" is positioned just after "ultimate loss." "Ultimate loss" is statutorily defined as the "actual loss amounts that a member is *obligated* to pay and that are paid or payable by the member . . . ." MCL § 3104(25)(c) (emphasis added). The obligation of the insurer is to fulfill its duty by honoring its contractual coverages. The duty to perform the contract relates back to the ultimate loss insofar as the ultimate loss includes payment of the obligation, i.e., the total contracted amount. Consequently, the MCCA must reimburse the insurers for 100 percent of the ultimate loss, which reflects the amount agreed between the insurer and the insured, and subject to PIP coverage. The ultimate loss specifically refers to coverage, which is broader than benefits and is not statutorily limited to reasonable payments.[16]

---

[16] The MCCA argues that if there is not a reasonableness factor for them to enforce, then the member insurers will have no incentive to make reasonable settlement deals that do not exceed the statutory threshold amount because the insurers will not be liable to pay anything beyond the threshold amount. However, one incentive comes from higher premiums paid to the MCCA. See MCL 500.3104(7)(d) (requiring that the MCCA assess its member companies an annual premium on each of their no-fault policies written in Michigan). If all the individual members act in a manner that does not regard the reasonableness of their settlements, then insurance premiums will increase greatly.

14

Moreover, the MCCA is not a no-fault insurer of its member companies and the member companies are not injured persons entitled to no-fault indemnification. Thus, the relationship between the MCCA and its members is not subject to the reasonableness requirements found in MCL 500.3107. Rather, the Legislature provided in § 3104(2) that the MCCA would "indemnify" the insuring members for PIP payments. The Legislature did not state that the MCCA would "insure" or "reinsure" the members for amounts greater than the threshold. Black's Law Dictionary (5th ed) defines "indemnify" as "[t]o restore the victim of a loss, in whole or in part, by payment . . . ; to secure against loss or damage . . . ." Indemnification is not a contingent plan like an insurance plan. Instead, it is a set security meant to assist against certain circumstances. Here, those circumstances arise when the PIP amount contracted by the insurer exceeds the statutory threshold.

Section 3401(1) states that the MCCA is "not subject to any laws . . . with respect to insurers." Thus, the MCCA is not a no-fault insurance agency, and consequently it is not a reinsurance agency either. Because the MCCA is not a no-fault insurer, but, rather, an indemnitor of no-fault insurers for benefits in excess of the statutory threshold, § 3107 does not directly bind the MCCA; it only binds the insurance members and the insured. Section 3107 "makes both reasonableness and necessity explicit and necessary elements of a *claimant's* [insured's] recovery . . . ." *Nasser v Auto Club Ins Ass'n*, 435 Mich 33, 49; 457 NW2d 637 (1990) (emphasis added). Specifically, it is the insurance company that has the right to

15

deny a claim (or part of a claim) for unreasonableness under § 3107. The *insured* then has the burden to prove that the charges are in fact reasonable. See generally *Nasser,* 435 Mich 33, *Manley v Detroit Automobile Inter-Ins Exch*, 425 Mich 140; 388 NW2d 216 (1986), and *LaMothe v Auto Club Ins Ass'n*, 214 Mich App 577; 543 NW2d 42 (1995). Given that the established burden of proof is on the insured, it is counterintuitive to conclude that the member insurance company would benefit from not having the burden of proof in one instance against an insured, but having the burden in another instance against the MCCA.

The MCCA maintains that the foregoing statutory constructions will lead to higher costs to the insured and will be a disincentive for member insurers to keep payments reasonable. These fears are unfounded. The MCCA is an unincorporated nonprofit association, whose purpose is to provide insurers with indemnification for PIP policies that exceed a certain threshold. See MCL 500.3104(1). The Legislature created the MCCA "in response to concerns that Michigan's no-fault law provision for unlimited [PIP] benefits placed too great a burden on insurers, particularly small insurers, in the event of 'catastrophic' injury claims." *In re Certified Question*, 433 Mich at 714. The MCCA maintains that it should have the ability to unilaterally stop making indemnification payments to a member when it determines that the claim payments are unreasonable. Yet, the MCCA acknowledges that a member can take the MCCA to court over a

16

reasonableness dispute, which would leave a finder of fact as the ultimate authority over whether the payments are reasonable.[17]

In essence, under the MCCA's preferred outcome, when a member insurer makes an agreement with an insured (often in a court setting, whether it be an arbitration hearing, consent judgment, or declaratory judgment), the member must then sue the MCCA if the MCCA finds that the payment is unreasonable. If this Court were to accept the MCCA's argument, the logical consequence would be that member insurers would be reluctant to settle with the claimant. The member insurer could then force a jury trial with every catastrophically injured claimant under this benefit in order to secure a verdict with a "reasonable" stamp on the result. This outcome goes against the legislative purpose of assuring efficient and quick recovery for claimants in the no-fault system. *Shavers v Attorney General*, 402 Mich 554, 578-579; 267 NW2d 72 (1978) ("The goal of the no-fault insurance system was to provide victims of motor vehicle accidents assured, adequate, and prompt reparation for certain economic losses.").

In response to the MCCA's concerns, it should be pointed out that the MCCA is not without a safeguard to protect against unreasonable payments. The Legislature specifically laid out powers that the MCCA could exercise to guard

---

[17] Presumably, under the statute, the costs of this trial would be covered or charged to the member insurer. See MCL 500.3104(7)(g) (the MCCA "may charge the cost of adjustment to the member" that the MCCA deems to have inadequate practices or procedures); MCL 500.3104(7)(b) ("Solely for the purpose of reporting claims, the member shall in all instances consider itself legally liable for the injuries or damages.").

against the possibility that an insurer might take inadequate steps to obtain a review and reasonable settlement of catastrophic claims. MCL 500.3104(7)(b) states that the MCCA shall:

> Establish procedures by which members shall promptly report to the association each claim that, on the basis of the injuries or damages sustained, may reasonably be anticipated to involve the association if the member is ultimately held legally liable for the injuries or damages. Solely for the purpose of reporting claims, *the member shall in all instances consider itself legally liable for the injuries or damages*. The member shall also advise the association of subsequent developments likely to materially affect the interest of the association in the claim. [Emphasis added.][18]

This statutory language establishes that the MCCA must create a structure whereby members are bound and liable to the MCCA to deliver paperwork regarding potential claims that would exceed the threshold and consequently affect the MCCA. The MCCA's plan of operation likewise echoes these statutory requirements.[19] Specifically, this language requires that the MCCA's safety check over the member's claim must occur upon the member's *anticipation* that the payment will affect the MCCA, or if the agreement has already been made, when

---

[18] Section 3104 includes numerous other rules for the MCCA, such as membership requirements, liability, and creation of a "plan of operation."

[19] Art X, § 10.01 of the plan of operation provides in part:

> Members shall report to the Association such information as the Board may require on forms prescribed by the Board: (a) As soon as practicable after the loss occurrence, Members shall report each claim which, on the basis of the injuries or damages sustained, may reasonably be anticipated to result in a Reimbursable Ultimate Loss, and for purposes of reporting the Member shall consider itself legally liable for the injuries and damages.

circumstances change and the member believes the payment to the insured will soon affect the MCCA.

It is *only* at these times, not after, that the MCCA can take action regarding the claim. MCL 500.3104(7)(g). Accordingly, the MCCA must respond in accordance with § 3104(7)(g). Under § 3104(7)(g), the MCCA must

> [e]stablish procedures for reviewing claims procedures and practices of members of the association. *If the claims procedures or practices of a member are considered inadequate to properly service the liabilities of the association, the association may undertake* or may contract with another person, including another member, *to adjust or assist in the adjustment of claims* for the member on claims that create a potential liability to the association and may charge the cost of the adjustment to the member. [Emphasis added.]

More clearly, when § 3104(7)(g) is read in conjunction with § 3104(7)(b), the outcome is that the MCCA is required to review those reports by members that anticipate needing indemnification and to assess the adequacy of the *procedures or practices* of the member. [20] Upon a finding of inadequacy, the MCCA can adjust the *practices or procedures* of the member.[21] One of the key protections

---

[20] The MCCA argued that since part of § 3104(7)(g) uses the term "may" instead of "must" in describing some of its potential powers, the MCCA has greater power than what directly follows in the statute to limit or control the individual member insurers. The MCCA wishes to conclude that since the section does not set forth a duty to act in a specific way (e.g., review claims), it allows the MCCA to act how *it* wants regarding member claims, including questioning their reasonableness. This is erroneous. The starting general presumption and purpose of the MCCA is to indemnify insurers for payments beyond the threshold amount, so that smaller insurance firms can continue to exist in the no-fault world of Michigan.

[21] The plan of operation also echoes the statute in this regard:

19

here is that MCCA has the power and duty to adjust *only* "procedures and practices" of the member that produce an unreasonable payment amount; the power does not include the power to adjust the amount.[22] The MCCA has the power to adjust situations that it anticipates will compromise its indemnification or will require it to pay unreasonable claims only if it can find fault with the member's methods or calculation of charges. Furthermore, the MCCA has the power, in adjusting the procedures and practices of member insurers, to require member insurers to inform the MCCA of any claim that could foreseeably exceed the statutory threshold and to afford the MCCA the opportunity to object to

---

> If a Member or 3103 Member refuses to timely submit the reports or information required of it pursuant to Section 10.01 or otherwise, or if the Board should determine that the reports and information submitted by a Member or 3103 Member are unreliable or incomplete, the Board may, at the member's expense, direct that an authorized representative of the Association (which may be another member) shall audit and inspect such member's records and compile the required information and data. [Art X, § 10.02.]

[22] Although § 3104(7)(g) states that the MCCA may "adjust or assist in the adjustment of claims," the practical effect of § 3104(7)(g) is that only the MCCA is able to adjust a member insurer's procedures and practices with regard to the reasonableness of the amounts paid to insureds. When the MCCA asserts its power to adjust or assist in the adjustment of a claim, the MCCA effectively steps into the shoes of the member insurer. The claim that the MCCA reviews for adjustment purposes is the claim made by the insured to the member insurer, not the reimbursement claim made by the member insurer to the MCCA. Thus, the MCCA, standing in the shoes of the member insurer, is limited to the member insurer's power to review the insured's claim for reasonableness as spelled out in the member insurer's policy, a settlement agreement, or a consent judgment. With regard to the reasonableness of the amount paid to the insured, the amount is still dictated by the amount that the member insurer is "obligated" to pay to the insured.

20

proposed settlement agreements regarding those claims. By requiring submission of proposed settlement agreements for the MCCA approval, the MCCA could protect against having to later pay unreasonable claims from member insurers. The exercise of these powers is the MCCA's safeguard from a member's neglect of its duties.

Finally, the MCCA argues that § 3104(8)(g) gives it the power to question reasonableness regardless of the statute's other provisions. Specifically, § 3104(8)(g) allows the MCCA to "[p]erform other acts not specifically enumerated in this section that are necessary or proper to accomplish the purposes of the association and that are not inconsistent with this section or the plan of operation." However, this section does not give the MCCA *carte blanche* to simply avoid whichever member insurer's agreement that it finds unreasonable. The power granted under § 3104(8)(g) is limited to accomplishing the "purposes of the association." More importantly, the exercise of this power cannot be "inconsistent with this section or the plan of operation." *Id*. The plan of operation, created by § 3104(17), must be "*consistent* with the objectives and provisions of this section, which shall provide for the economical, fair, and nondiscriminatory administration of the association *and for the prompt and efficient provision of indemnity*." MCL 500.3104(17) (emphasis added).

Section 3104(8)(g) allows the MCCA to fulfill the specific requirements of the statute. Accordingly, I would interpret § 3104(8)(g) as granting the MCCA the limited power to further its purpose of prompt and efficient indemnification to its

21

members.  To interpret that section as granting any further power, such as the power to decline indemnification on the basis of the reasonableness of the indemnification amount, would be inconsistent with the intention of the Legislature.

## IV.  CONCLUSION

I would hold that the indemnification obligation set forth in § 3104(2) does not incorporate the reasonableness standard that § 3107 requires between claimants and member insurers.  Furthermore, the powers granted to the MCCA in § 3104(7) are limited to adjusting the "practices and procedures" of the member insurers and do not encompass adjustment to the payment amount agreed to between claimants and member insurers.

Finally, I would hold that the power granted to the MCCA under § 3104(8)(g) is limited to furthering the purposes of the MCCA, and that determining reasonableness is not one of its purposes.

Accordingly, I dissent and would affirm the Court of Appeals holding that the MCCA must reimburse its member insurers 100 percent of the ultimate loss exceeding the statutory threshold for claims regardless of the reasonableness of the amount.

Elizabeth A. Weaver
Michael F. Cavanagh
Marilyn Kelly

22